UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff | ) ) ) |
| v. | ) ) Civil No. 05-163-P-H |
| CAP QUALITY CARE, INC., | ) ) ) |
| Defendant | ) ) |

**RECOMMENDED DECISION**

CAP Quality Care, Inc. has moved to dismiss the first eight counts of the Government's 20-count second amended complaint, alleging that the Government has failed to plead Medicaid fraud with sufficient particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure. I recommend the Court deny the motion to dismiss.

**Rule 12(b)(6) Standard**

A motion to dismiss pursuant to Rule 12(b)(6) constitutes a threshold challenge by one party to the adequacy of another party's claim or claims. The party filing such a motion contends that one or more of an opponent's claims is fundamentally flawed because the underlying allegations, even if true, fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). When reviewing a 12(b)(6) motion, a court is generally required to (1) treat all of the non-movant's factual allegations as true and (2) draw all reasonable factual inferences that arise from the allegations and are favorable to the non-movant. Carroll v. Xerox Corp., 294 F.3d 231, 241 (1st Cir. 2002). In the end, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). Such indulgences are granted

to the non-movant pursuant to Rule 8, which requires of claimants only a "short and plain statement of the claim" sufficient to provide the adverse party with fair notice of the claim and the grounds on which it rests. Fed. R. Civ. P. 8(a)(2); Swierkiewicz v. Sorema N. A., 534 U.S. 506, 512 (2002). Rule 12(b)(6) does not provide an avenue for defendants to challenge the underlying merits of a case. Swierkiewicz, 534 U.S. at 512 ("[N]otice pleading . . . relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims.").

Notwithstanding the foregoing, Rule 9 imposes a heightened pleading standard with regard to certain types of factual allegations, including allegations of fraud. Where fraud is a necessary element of a claim, "the circumstances constituting fraud . . . shall be stated with particularity." Fed. R. Civ. P. 9(b). Generally, a fraud claimant must be prepared at the very commencement of his or her case to present allegations of fraud that are specific with respect to the time, place and content of an alleged false representation. Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996). However, this does not mean that a fraud claimant must allege all of the circumstances and evidence from which fraudulent intent might be inferred. Id.

**The Factual Allegations**

The second amended complaint (Docket No. 37) is sixty-nine pages long, not counting the four-page table of contents provided at the beginning of the document. The first forty-five pages of the Second Amended Complaint provide background information and specific allegations regarding claimed statutory and/or regulatory violations in regard to the treatment of dozens of patients who are identified by patient identification number. (Id. ¶¶ 1-367.) Those allegations are then incorporated by reference into each of the eight substantive counts that are the subject of this Motion to Dismiss.

It is well-established that the heightened pleading standard of Rule 9(b) applies to claims made under the False Claims Act. See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 228 (1st Cir. 2004). Counts 1 through 3 (the False Claims Act claims) all begin by incorporating over 367 allegations regarding CAP's alleged unlawful practices. Count 1 alleges that these practices demonstrate that "CAP knowingly presented, or caused to be presented, to officers, employees or agents of the United States Government false or fraudulent claims for payment or approval." (Sec. Am. Compl. ¶ 369.) Count 2 alleges that "CAP knowingly made, used, or caused to be made or used, false records or statements to get false or fraudulent claims paid or approved by the United States." (Id. ¶ 372.) Count 3 alleges that "CAP knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money to the Government." (Id. ¶ 375.) Based only on these three count-specific allegations, CAP argues that the Government has failed to comply with Rule 9(b) with respect to counts 1-3. (Mot. to Dismiss at 4-5.) In its motion CAP offers no analysis whatsoever of the initial 367 factual allegations of the second amended complaint. Count 5 is captioned as a common law fraud claim. The claim incorporates all of the preceding factual allegations and also alleges that "CAP knowingly and intentionally made or caused to be made false statements or omissions of material facts to Medicaid and thus to the United States with knowledge of their falsity and with fraudulent intent, to mislead the United States and upon which the United States reasonably relied to its injury." (Sec. Am. Compl. ¶ 385.) CAP again argues that the Government has failed to comply with Rule 9(b) based exclusively on paragraph 385, without giving any consideration to the sufficiency of the 367 factual allegations on which it obviously depends. (Mot. to Dismiss at 5.) Count 4 alleges unlawful distribution of methadone in violation of 42 U.S.C. § 8.12(i), based on the alleged

failure to follow "the 8-point criteria and the time-in-treatment requirements of 42 C.F.R. § 8.12(i)," and seeks the imposition of civil penalties. (Sec. Am. Compl. ¶¶ 378.) Count 6 alleges that the Government made payments to CAP by mistake and seeks "the recovery of monies." (Id. ¶ 388.) Count 7 asserts a claim for recovery of monies as well, but is premised on a theory of unjust enrichment. (Id. ¶ 392.) Count 8 asserts a request for "a full accounting . . . and disgorgement of all profits from [CAP's] false or fraudulent claims for methadone treatment." (Id. ¶ 396.) CAP argues that counts 4, 6, 7 and 8 should be dismissed along with the fraud claims because they build on the fraud claims. (Mot. to Dismiss at 5-6.)

The 367-paragraph prelude to the various counts set forth in the Government's second amended complaint includes, among other allegations, an overview of the statutory and regulatory backdrop for the Government's allegations of Medicaid fraud. (Compl. ¶¶ 11-31.) The thrust of this section is that it is a fraudulent act for providers to submit claims for Medicaid reimbursement if they have not complied with all statutory and regulatory preconditions imposed on the delivery of services in order for them to qualify for Medicaid reimbursement. (Id.) In short, if the preconditions are not met, then the service is not covered by Medicaid and it is a fraudulent act to submit a request for Medicaid reimbursement for services that are not covered by the program. (Id. ¶¶ 19-25.) Based on these background allegations, the second amended complaint discusses the provision of methadone maintenance take-home treatments to over 30 patients who are identified by patient number and who, according to the Government, were not eligible for the treatments they received, which means that CAP was not entitled to reimbursement by Medicaid. (Id. ¶¶ 60-184.) According to the Government, for each patient CAP received $80 per week for providing methadone maintenance services. (Id. ¶ 15.) For each patient the Government sets forth the reason why it contends the treatments were not eligible for

Medicaid reimbursement.  (Id.)  These allegations do not set forth precise dates for the services in question.  However, they do contain general statements on the issue of timing.  For example, concerning patient M602 it is alleged that "CAP began providing M602 with take-home methadone, on a seven (7) day per week basis, just ninety-five (95) days after M602 began treatment with CAP."  (Id. ¶ 64.)  Such seven-day per week treatments, the Government informs us, are prohibited until the patient has completed a full year of treatment.  (Id. ¶ 55.)  According to the Government, the graduated dispensation of take-home methadone and the adherence to the eight-point criteria is designed "to limit the potential for diversion of methadone to the illicit market."  (Id. ¶ 49.)[1]

Following the allegations about patient M602 and another patient, the remaining patient-by-patient allegations are in the following form:  "As of March 6, 2002, patient M538 did not qualify for seven-day-per-week take-home methadone because he/she had only been in continuous methadone maintenance treatment for approximately two weeks."  (Id. ¶ 84.)  Thus, the second amended complaint is replete with similar temporal allegations from which CAP could ascertain, in addition to the circumstances, the dates on which the Government contends CAP began providing treatments in violation of the alleged statutory and regulatory requirements.  (Id. ¶¶ 87, 90, 93, 96, 99, 102, 108, 111, 114, 117, 121, 124, 130, 133, 136, 139, 142, 145, 148, 151, 155, 158, 161, 164, 167, 170, 173, 177; see also id. ¶¶ 182-184 (phrasing the temporal allegations somewhat differently.)  In each instance, the Government alleges that CAP gave the patient a full seven-day take home treatment well ahead of the one-year timetable and states the date on which such treatments commenced.  (See, e.g., id. ¶ 86.)

---

[1]  It appears that the Government bears the cost of the increased volume of methadone dispensed, in addition to the $80 weekly, per-patient service fee, although the second amended complaint is not clear on this point.  (See Sec. Am. Compl. ¶ 19, concerning the availability of Medicaid reimbursement for supplies in addition to services.)

A second battery of allegations concerns CAP's alleged falsification of patient treatment records. The patient-by-patient allegations again follow a pattern that provides some temporal detail. For example, the second amended complaint alleges:

> 199. CAP's official records falsely represent that patient 24 met with his or her CAP counselor on December 20, 2001, for a treatment plan review.
>
> 200. However, on December 20, 2001, patient 24 was in a 'carry' status which means that he/she was not at the clinic that day.

(Id. ¶¶ 199-200.) This pattern is essentially repeated over the next 71 paragraphs concerning another 11 patients and additional records entries made on various dates specified in the second amended complaint. (Id. ¶¶ 201-271.)

The next group of allegations concerns failure to maintain required documentation that required counseling services were provided prior to or in connection with treatment. According to the Government, CAP wrongfully billed Medicaid for counseling services that were either not in fact provided or were not adequately documented in connection with certain specific patients. The temporal aspect of these allegations is in the following form:

> 284. Patient M330 received no documented counseling in his/her first 244 days of treatment at CAP.

This form of allegation is then repeated for seven other patients. (Id. ¶¶ 285-291.)

Following these allegations are two groups of allegations concerning failure to develop individualized treatment plans for each patient receiving covered services, based on a comprehensive assessment of each client's needs (id. ¶¶ 292-301) and failure to review those plans within the first 90 days of treatment (id.). The patient-specific allegations include some temporal information and are in the following form:

> 302. As of June 20, 2003, the date of the HHS on-site review, CAP's official medical records did not include any individualized treatment plans for Patient M58.

This allegation is then repeated in reference to 24 other patients as well. (Id. ¶¶ 302-326.) As for allegations that CAP failed to conduct its 90-day reviews, the allegations take the following form:

> 336. Because of CAP's failure to review the treatment plan for patient M218 at any time between January 10, 2002 and April 21, 2003, CAP's treatment plan review for patient M218 was at least 468 days late (i.e., 468 days after the 90 day review was required under Medicaid rules).

(Id. ¶ 336.) This pattern is repeated concerning another 19 patients. Each allegation sets forth different dates for each patient. (Id. ¶¶ 337-355.)

The final group of fraud allegations concerns Marc Shinderman's practice of medicine in the provision of Medicaid services after his Maine license to practice medicine had expired. The second amended complaint relates that the license expired August 9, 2002. (Id. ¶ 356.) According to the Government, "CAP wrongfully billed Medicaid for medical treatment provided by Marc Shinderman after the expiration of his Maine medical license." (Id. ¶ 365.)

There are ten exhibits attached to the second amended complaint. None of the exhibits itemizes the allegedly fraudulent Medicaid billings on which the Government's fraud claims are based. Sometime during the course of discovery, the Government produced a 29-page spreadsheet that itemizes the billings by claim number and correlates each billing to the particular patient and violation outlined in the second amended complaint. (Gov't Resp. Ex. 1.) In addition, the Government produced another spreadsheet of four pages that lists instances of Dr. Shinderman's unlicensed practice of medicine, including the date of each instance. It is impossible to determine from the document whether CAP made any billings in connection with the various, alleged instances of unlicensed medical practice. (Id. Ex. 2.)

The seconded amended complaint informs us that the allegations regarding the violations and false claims reported therein have been informed by the Government's review of CAP's files. (Sec. Am. Compl. ¶¶ 32-33, 40, 44, 47, 48.)

## Discussion

The Government's opposition to the motion to dismiss recounts all of the ways in which the allegations in the second amended complaint demonstrate the existence of numerous statutory and regulatory violations and then asserts that CAP knowingly billed for the services provided despite the violations and supported the billings with falsified records. (Gov't Resp. at 1-7.) The Government also points to its 29-page disclosure spreadsheet, fairly describing it as listing "*patient-by-patient, week-by-week, claim number-by-claim number*, each of the alleged 'Medicaid Fraud and Recoupment' violations," as well as the four-page spreadsheet, unfairly suggesting that it links instances of unlicensed medical practice with actual Medicaid billings. (Id. at 10.) According to the Government these spreadsheets were produced in December 2005, about one month before the Government filed its second amended complaint. (Id.) On the central issue of whether the fraud claims are alleged with sufficient detail, the Government recognizes its burden of providing fraud allegations that are specific with respect to time, place and content and argues that its second amended complaint is sufficiently particularized because, "[r]egarding CAP's distribution of methadone to ineligible patients, the Amended Complaint specifically identifies each patient by confidential identification number, the dates of treatment, and the applicable specific representations in each patient file." (Id. at 17.)[2]  As for the alleged failure to provide and review treatment plans, the Government likewise argues that "[f]or each, the Amended Complaint identifies the applicable regulations, patients and dates." (Id. at 18.)  As

---

[2] The Government also responds with arguments as to why the allegations in the second amended complaint are sufficient to support an inference of fraudulent intent. I have largely disregarded these arguments because they are not really germane to the Rule 9(b) time, place and content inquiry.

for the unlicensed practice of medicine, the Government states that the second amended complaint "specifically identifies and quotes five (5) such instances and attaches (as Exhibit 2) a CAP internal report indicating four (4) more instances." (Id.) Finally, the Government argues that the spreadsheets it produced in discovery provide CAP with all the specificity it could desire. (Id. at 19.)

With respect to counts 4 (seeking civil penalties for statutory and regulatory violations), 6 (seeking recovery for payments made by mistake of fact), 7 (asserting an unjust enrichment claim) and 8 (seeking disgorgement and accounting), the Government argues that Rule 9(b) is simply inapplicable because none of the claims requires proof of fraud. (Id. at 12.) In closing, the Government faults CAP's motion to dismiss for its own lack of specificity, particularly with regard to its utter failure to analyze the patient-specific allegations that are set forth in the second amended complaint. (Id. at 19.) According to the Government, the Court ought to deny the motion based simply on its failure to actually engage in any analysis. (Id. at 20, citing One Bancorp Sec. Litig., 134 F. R. D. 4, 10 n.5 (D. Me. 1991).)

In reply, CAP gets to the heart of the matter: the alleged false statements that underlie the Government's fraud claims are, specifically, CAP's billing statements, and the second amended complaint does not alleged with specificity the time, place and content of the billing statements themselves. (Def.'s Reply at 1-2, Docket No. 58.)[3] As for the spreadsheets, CAP asserts that they cannot be considered for purposes of the motion to dismiss because they were not incorporated into or even attached to the complaint. (Id.) CAP also argues that non-fraud counts 4, 6, 7 and 8 should be dismissed as well because the Government placed them under the

---

[3] See United States ex rel. Karvelas, 360 F.3d at 232 ("A health care provider's violation of government regulations or engagement in private fraudulent schemes does not impose liability under the FCA unless the provider submits false or fraudulent claims to the government for payment based on these wrongful activities.").

9

"Medicaid Fraud and Recoupment" heading of the second amended complaint and seeks to support them with the same allegations that the fraud claims rely on. (Id. at 4.)

The purposes of the specificity or particularity requirement of Rule 9(b) are to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996). The only purposes implicated in this case would be the desire to provide notice to the defendant and to protect the defendant from the injury to its reputation that would naturally arise from allegations of fraud. There is no suggestion by CAP that any other interests are at stake here. The Government is not engaged in the business of bringing strike suits and the documents and other exhibits on which this case is based were predominantly collected by the Government by means of an administrative subpoena and search warrant—not by means of discovery. As for the fraudulent billings themselves, all are sufficiently particularized by reference to the specific patients and timeframes at issue, in addition to other allegations concerning the circumstances surrounding the record-keeping and documentation practices at issue. In effect, a reasonable defendant in CAP's position would have little difficulty determining exactly which billings are implicated in the second amended complaint. CAP certainly makes no suggestion that the initial 367 factual allegations of the second amended complaint leave it guessing as to what billings the Government is referring to or the reason why the Government contends they were falsely presented.

In my view, the Government has adequately alleged its fraud and false claims counts so that CAP can ascertain with specificity exactly which Medicaid billings are in issue and the reason why the billings are alleged to have been fraudulent. Having said that, I am still

10

concerned that precedent in this Circuit may call for dismissal anyway because of the failure of the Government to itemize actual billing statements in the second amended complaint. Although the spreadsheet that is exhibit 1 of the Government's response appears to do just that, that document was not mentioned in, or appended to, the second amended complaint. In <u>United States ex rel. Karvelas</u>, the Court of Appeals for the First Circuit asserted the following statement of law in a qui tam, false claims action:

> Underlying schemes and other wrongful activities that result in the submission of fraudulent claims are included in the "circumstances constituting fraud or mistake" that must be pled with particularity pursuant to Rule 9(b). However, such pleadings invariably are inadequate unless they are linked to allegations, stated with particularity, of the actual false claims submitted to the government that constitute the essential element of an FCA [False Claims Act] qui tam action.
>
> As applied to the FCA, Rule 9(b)'s requirement that averments of fraud be stated with particularity - specifying the "time, place, and content" of the alleged false or fraudulent representations, means that a relator must provide details that identify particular false claims for payment that were submitted to the government.[Footnote omitted.]   In a case such as this, details concerning the dates of the claims, the content of the forms or bills submitted, their identification numbers, the amount of money charged to the government, the particular goods or services for which the government was billed, the individuals involved in the billing, and the length of time between the alleged fraudulent practices and the submission of claims based on those practices are the types of information that may help a relator to state his or her claims with particularity. These details do not constitute a checklist of mandatory requirements that must be satisfied by each allegation included in a complaint. However, like the Eleventh Circuit, we believe that "some of this information for at least some of the claims must be pleaded in order to satisfy Rule 9(b)." [Footnote omitted.]

<u>United States ex rel. Karvelas</u>, 360 F.3d at 232-233 (citing <u>United States ex rel. Clausen v. Lab. Corp. of Am.</u>, 290 F.3d 1301, 1312 n.21 (11th Cir. 2002)). In its analysis of <u>Karvelas</u>, the Court of Appeals faulted the qui tam relator plaintiff for "never specif[ying] the dates or content of any particular false or fraudulent claim allegedly submitted for reimbursement by Medicare or Medicaid[, or] identification numbers or amounts charged in individual claims for specific tests, supplies, or services." <u>Id.</u> at 233. In addition, the Court faulted the plaintiff for not setting forth

11

the "specifics . . . of any one single cost report, or bill, or piece of paper that was sent to the Government to obtain funding . . . . [or] the source of information and factual basis for his conclusory allegations that the defendants submitted actual false or fraudulent claims to the government." Id.

The Government's second amended complaint in this case would appear to exceed considerably the wholly conclusory complaint in Karvelas. In particular, the patient-specific references and the temporal references discussed above adequately informed CAP of the methadone maintenance billings that are implicated in the Government's action.[4] Moreover, the specific reference to statutory and regulatory obligations ties each patient reference to a definite category of false statement. As importantly, the second amended complaint demonstrates that the allegations regarding those patients and those categories are informed by the Government's actual review of CAP's files; the Government is not merely making allegations based on information and belief without disclosing the source of its information and belief, as was largely the case in Karvelas. Id. at 234. The Government alleges, and the Court must take as true, that the basis for the Government's knowledge consists of CAP's own internal records and files. Thus, even though the second amended complaint fails, for example, to set forth the specifics of any one billing statement actually presented to the Government for payment, it does provide sufficient detail for CAP to determine the particular methadone maintenance billings by patient and by timeframe, even without the aid of the exhibits produced by the Government in the course of discovery. I am not persuaded that more is required under Rule 9(b) because the general timing, relevant patient numbers and content (or substance) of the false statements are all set forth, well beyond the minimal pleading requirements of Rule 8 and in a manner that is sufficient

---

[4] I have not pondered the significance of "place," as opposed to "time" and "content" here because, as the Court of Appeals has indicated, "the concept of 'place' holds less relevance for allegations about fraudulent bills or other claims allegedly submitted to the government." United States ex rel. Karvelas, 360 F.3d at 232 n. 16.

to serve all of the ameliorative purposes behind the heightened pleading requirement of Rule 9(b).[5]

Because the fraud claims are adequately alleged in the second amended complaint there really is no need to further address whether the non-fraud claims are adequately pleaded. Nevertheless, should the Court disagree with the foregoing analysis, I conclude that the non-fraud claims that do not depend on the False Claims Statute should be evaluated under the notice pleading standard of Rule 8 and not the heightened pleading standard of Rule 9(b), in effect, as though the fraud counts had been excised from the complaint. I have been unable to find a case directly on point, but agree with the Government that the various persuasive precedents it cites reflect the inadvisability of applying Rule 9(b) to, for example, a common law unjust enrichment claim. (Gov't Response at 12-13.) The precedent cited by CAP reflects a "sounds in fraud" heightened pleading rule sometimes applied in securities litigation. See, e.g., Glassman v. Computervision Corp., 90 F.3d 617, 628 n.13 (1st Cir. 1996) (flagging the issue in a shareholders' suit but not addressing it). I am not persuaded that such a rule would be appropriate to this kind of case.

---

[5]  It is not easy for me to gauge the degree to which the qui tam nature of the action in Karvelas informed the Court of Appeal's treatment of Rule 9(b) in that case. The non-mandatory checklist, in particular, appears unusually daunting. It is the case, of course, that qui tam actions raise particular concerns in relation to preventing strike suits and "fishing expeditions." The real question is just how strict the Court of Appeals's Rule 9(b) standard is in a false claims case commenced by the Government after a rather comprehensive review of the defendant's documents and records. I note that there is a parallel line of authority developing elsewhere on the Rule 9(b) question that appears to be a little less strictly worded than what is suggested by First Circuit precedent, although it is hard to gauge what functional difference exists with regard to the particular facts of the various cases. See, e.g., Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 791 (3d Cir. 1984) ("Rule 9(b) requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior. It is certainly true that allegations of 'date, place or time' fulfill these functions, but nothing in the rule requires them. Plaintiffs are free to use alternative means of injecting precision and some measure of substantiation into their allegations of fraud."), cert. denied, 469 U.S. 1211 (1985); Fed. Sav. & Loans, Ins. Corp. v. Shearson-Am. Express, 658 F. Supp. 1331, 1336-37 (D. P.R. 1987) (citing Seville and asserting that notice remains the overriding concern). See also United Fish Co. v. Barnes, 627 F. Supp. 732, 733 (D. Me. 1986) (citing Seville and observing: "The First Circuit has enunciated an approach to the particularity requirement of Rule 9(b) that appears to require a more detailed allegation of fraud in the complaint than would be required by some other courts.").

## Conclusion

For the reasons set forth above, I recommend that the Court DENY the defendant's motion to dismiss.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

/s/ Margaret J. Kravchuk
U.S. Magistrate Judge

Dated April 14, 2006