***UNITED STATES DISTRICT COURT***
***DISTRICT OF MAINE***

| | | |
|---|---|---|
| ***UNITED STATES OF AMERICA,*** | ***)*** | |
| | ***)*** | |
| ***Plaintiff*** | ***)*** | |
| | ***)*** | |
| ***v.*** | ***)*** | ***Docket No. 05-163-P-H*** |
| | ***)*** | |
| ***CAP QUALITY CARE, INC.*** | ***)*** | |
| | ***)*** | |
| ***Defendant*** | ***)*** | |

***MEMORANDUM DECISION ON MOTION TO QUASH SUBPOENA AND MOTION TO COMPEL RESPONSE TO SUBPOENA DUCES TECUM***

The Maine Board of Licensure in Medicine ("Board") moved orally during a telephone discovery dispute conference on May 23, 2006 to quash the subpoena served by the defendant on the Board's former investigator, Elizabeth Harwood, for a deposition then scheduled for May 24, 2006.[1] Report of Hearing and Order Re: Discovery Dispute (Docket No. 88) at 2. I ordered the deposition postponed pending the court's ruling on that motion and directed counsel for the Board and for the defendant to submit simultaneous written memoranda and replies on the issue. *Id*. Those memoranda have now been filed. Not addressed at the telephone conference was the Board's objection to a subpoena also served by the defendant on the Board commanding the production of "[a]ny and all documentation" concerning the application of Dr. Marc S. Shinderman for a medical license and his authority to practice medicine and "[a]ny and all correspondence" referencing or documenting any

[1] It is the motion to quash the subpoena and not, as counsel for the defendant asserts, "an objection made pursuant to Fed. R. Civ. P. 45(c)(2)(B)," CAP Quality Care's Memorandum of Law in Response to Objections Pursuant to Fed. R. Civ. P. 45(c)(2)(B) by the Maine Board of Licensure in Medicine, etc. ("CAP Brief") (Docket No. 92) at 1, that is before the court with respect to the deposition.

correspondence between the Board and employees of the state, county or federal government regarding Dr. Shinderman, which these parties also address in their written submissions. Brief of the Maine Board of Licensure in Medicine in Opposition to CAP Quality Care, Inc.'s Subpoe[nas] Pursuant to Maine Law and F.R.Civ.P. 45(c)(3)(A)(iii) ("Board Brief") (Docket No. 90) at 2; CAP Brief at 1. CAP also asks the court to compel the Board to comply with the latter subpoena. CAP Brief at 1.

CAP seeks to take the deposition of Elizabeth Harwood, a former investigator for the Board, who contacted an investigator for the federal Drug Enforcement Administration in 2002 about Dr. Shinderman and who prepared a memorandum about Dr. Shinderman for the October 14, 2003 meeting of the Board. CAP Brief at 3-5. In an e-mail dated May 10, 2002 Harwood stated: "We are investigating [Dr. Shinderman] informally . . . ." *Id*. at 6. She faxed a copy of the report of a Board-ordered evaluation of Dr. Shinderman to the DEA investigator on June 2, 2003. *Id*. at 13. CAP contends that its proposed deposition of Harwood "may lead to admissible evidence supporting some or all of the affirmative defenses alleged in its answer to the complaint." *Id*. at 16. It alleges that counsel for the Board "is attempting to foreclose any deposition inquiry into the involvement of Ms. Harwood with federal authorities in the withholding of Dr. Shinderman's licensure in Maine, despite a ruling by Magistrate Judge Kravchuk that communications between federal agents and the Board relating to the non-renewal of Dr. Shinderman's license or his prescription writing practices are discoverable within the meaning of Fed. R. Civ. P. 26." *Id.* at 19.

The Board responds that Judge Kravchuk "did not deal with the particular issue before this Court." Reply Brief of the Maine Board of Licensure in Medicine in Opposition to CAP Quality Care, Inc.'s Subpoenas, etc. ("Board Reply") (Docket No. 94) at 7. In addition, the Board asserts that the subpoenas at issue at this time "seek far broader information and communications than those ruled upon by Magistrate Judge Kravchuk," before whom no claim of confidentiality and investigative

information was made. *Id.* In an order following a telephone conference held on May 5, 2006, at which one of the agenda items concerned the plaintiff's instruction to DEA agent Masar at her deposition not to answer certain questions, Judge Kravchuk wrote:

> The information that relates to Masar's contact with the Maine Licensing Board prior to August 9, 2002, when they decided not to renew Dr. Shinderman's temporary Maine license to practice is discoverable as long as this complaint alleges Dr. Shinderman practiced medicine without a State of Maine license as one of its claims. Questions of communication between the DEA agent (JoAnne Masar) and the Maine Licensing Board that ultimately resulted in the August 9, 2002, non-renewal of Dr. Shinderman's license is discoverable within the meaning of Rule 26, even though this information might relate to Dr. Shinderman's prescription writing practices and thus also be the subject of the criminal indictment. The Government insists there is a bright line between the criminal investigation of alleged prescription writing practices (DEA criminal investigation) and the State of Maine's decision not to renew Shinderman's temporary license. However, it appears to me that at least ¶¶ 34, 37, 42, 45, 356, 361, & 367 of the civil complaint touch upon Dr. Shinderman's prescription writing practices and this information is intertwined with the licensing decision. This order does not require Masar to disclose her conversations with Donald Clark, the AUSA handling the criminal prosecution of Dr. Shinderman.

Report of Telephone Conference and Order (Docket No. 79) at 2-3. The Board was not represented at this conference nor was counsel for the Board present at the Masar deposition. That fact alone makes it impossible for Judge Kravchuk's ruling to bind the Board in the present controversy. In addition, all that Judge Kravchuk's order addressed was questions posed to Masar at her deposition. *Id*. at 2. A ruling on that very limited issue cannot be expanded to address this distinct and different limited issue. It most definitely cannot be applied to allow CAP "to depose Ms. Harwood on that subject matter regardless of its [sic] ruling on the applicability of State confidentiality restrictions with regard to the documents." CAP Brief at 19. I will not consider Judge Kravchuk's ruling further with respect to the matters at issue here.

The Board "direct[s] staff to review and approve applications for licensure or renewal in accordance with criteria established in law or in rules adopted by the board. Licensing decisions

made by staff may be appealed to the full board." 32 M.R.S.A. § 3269(17). The Board may issue a temporary license for a period not to exceed one year "when the board determines that this action is necessary in order to provide relief for local or national emergencies or for situations in which the number of physicians is insufficient to supply adequate medical services or for the purpose of permitting the physician to serve as locum tenens[2] for another physician who is licensed to practice medicine in this State." 32 M.R.S.A. § 3276. In 1994 the Board adopted a policy providing that temporary licenses are not renewable after one year. Section IV – Board Policy Temporary Licenses – Time Restriction (Exh. H to Board Brief). Dr. Shinderman was granted a temporary license for six months, to expire on February 9, 2002. Temporary License (Exh. E to Board Brief). At the request of the state licensing specialist who licensed the CAP Quality Care clinic in Westbrook Maine, Exh. F to Board Brief, a second temporary license was issued to Dr. Shinderman, with an expiration date of August 9, 2002, Exh. G to Board Brief. Dr. Shinderman did not file an application to renew this license. He filed an application for a permanent license on July 26, 2002. Maine Medical License Application Flowsheet (Exh. R to Board Brief). The statute dealing with renewal of medical licenses provides for renewal of licenses issued "pursuant to section 3271 or 3275," 32 M.R.S.A. § 3280-A(1); those sections deal with initial full licensure by the Board and licensure by reciprocity. Significantly, temporary licenses granted under section 3276 are not mentioned in the renewal statute.

An applicant for full licensure by the Board may not be licensed "unless the board finds that the applicant is qualified and no cause exists, as set forth in section 3282-A, that may be considered

[2] "A physician who is qualified under section 3275 [licensure by reciprocity] may, at the discretion of the board, be given a temporary license to be effective for not more than 6 months after issuance for the purpose of permitting the physician to serve as 'locum tenens' for some other physician who is then licensed to practice medicine in this State and whose own license is not temporary or limited . . . if the Maine physician is unable to maintain the practice because of illness or because of absence from the general locus of this physician's practice or for other reasons determined sufficient by the board." 32 M.R.S.A. § 3278 (2002). This statute was repealed and replaced in 2003 to read as follows, in pertinent part: "A physician who presents a current active unconditioned license from another United States licensing jurisdiction and who can provide reasonable proof of meeting qualifications for licensure in this State must be issued a license to serve temporarily for declared emergencies in the State or for other appropriate reasons as determined by (*continued on next page*)

grounds for disciplinary action against a licensed physician . . . ." 32 M.R.S.A. § 3271(5). Further, "[w]hen an individual applies for a license under this chapter, the board may investigate the professional record of that individual, including professional records that the individual may have as a licensee in other states." 32 M.R.S.A. § 3282-A(1). The grounds for "an action to refuse to issue" a license are set forth at section 3282-A(2). The Board may also investigate former licensees and allegations of unlicensed practice. 10 M.R.S.A. § 8003-C(1); *Golz v. Maine Real Estate Comm'n*, 634 A.2d 1288, 1289 (Me. 1993).

The statute on which the Board relies in the matter now before the court provides, in pertinent part:

> **1. During investigation.** Unless otherwise provided by Title 24, chapter 21, all complaints and investigative records of the licensing boards and commissions within or affiliated with the Department of Professional and Financial Regulation are confidential during the pendency of an investigation. Those records become public records upon the conclusion of an investigation unless confidentiality is required by some other provision of law. For purposes of this section, an investigation is concluded when:
>
> **A**. A notice of an adjudicatory hearing under Title 5, chapter 375, subchapter IV has been issued;
> **B.** [Repealed]
> **C.** A consent agreement has been executed; or
> **D.** A letter of dismissal has been issued or the investigation has otherwise been closed.
>
> **2. Exceptions.** Notwithstanding subsection 1, during the pendency of an investigation, a complaint or investigative record may be disclosed:
>
> * * *
>
> **G.** To the person investigated on request. The commissioner may refuse to disclose part or all of any investigative information, including the fact of an investigation, when the commissioner determines that disclosure would prejudice the investigation. The authority of the commissioner to make such a determination shall not be delegated.

---

the board. The license is effective for not more than 100 days. 32 M.R.S.A. § 3278 (2005).

10 M.R.S.A. § 8003-B(1) & (2).[3] The acting commissioner of the Department of Professional and Financial Regulation has exercised his discretion not to release investigative information sought by CAP from the Board. Letter dated March 23, 2006 from Dennis E. Smith, Assistant Attorney General, to Michael A. Cunniff, Esq. (Exh. A to Board Brief) at 3.[4]

It is clear that Ms. Harwood's deposition testimony is being sought by CAP only because she was involved in the Board's investigation of Dr. Shinderman. Any testimony about that investigation would involve the release of "investigative information" as that term is used in section 8003-B.[5] CAP does not contend otherwise. Accordingly, I will analyze the application of section 8003-B to the deposition subpoena and to the subpoena for documents together.

In addition to the argument that Judge Kravchuk's prior discovery ruling made discoverable "communications between federal agents and the Board relating to the non-renewal of Dr. Shinderman's license or his prescription writing practices," CAP Brief at 21, which I have rejected for the reasons discussed above, CAP contends that the provisions of section 8003-B do not apply to the proposed deposition of Harwood and the documents subject to its subpoena and not yet produced by the Board because (i) "there is absolutely nothing about the nature and circumstances of Sharon P.'s complaint that has not been disclosed during the Superior Court proceedings [in a civil action filed by Sharon P. against Dr. Shinderman and CAP]," CAP Brief at 20; (ii) the Board has "waived its right to assert confidentiality on account of its own misconduct" in broadening the scope of its investigation of

[3] "Title 24, chapter 21" refers to 24 M.R.S.A. § 2501 *et seq*., the Maine Health Security Act, which deals with professional competence reports and medical malpractice claims, neither of which is involved in the matter now before this court. The Board is affiliated with the Department of Professional and Financial Regulation. 10 M.R.S.A. § 8001-A(4).

[4] CAP contends that this determination by the commissioner "is inadequate because . . . it related to the Freedom of Access Act request, not with regard to the civil subpoena or Ms. Harwood's deposition, which involve different considerations." CAP Quality Care's Reply to the Brief Submitted by the Maine Board of Licensure in Medicine ("CAP Reply") (Docket No. 96) at 3. It does not identify those "different considerations." Because the commissioner's determination was made with respect to the very information sought by the subpoena and deposition at issue, the fact that it may have been made before the subpoenas were served is irrelevant.

[5] Counsel for the Board informed counsel for CAP that he would not object "to general questions concerning standard operating procedures for conducting investigations" during any deposition of Harwood. CAP Brief at 19.

the Sharon P. complaint without notifying Dr. Shinderman, *id*. at 22-23; (iii) Harwood's communications with Masar regarding Dr. Shinderman's prescription practices are outside the scope of the Sharon P. complaint and thus discoverable, *id*. at 23; (iv) the Board's investigation was closed "for all intents and purposes" when it received the report of Dr. Barry, who evaluated Dr. Shinderman at the Board's request, *id*. at 23-24; (v) the Board's investigation was closed when it decided not to act on Dr. Shinderman's application for permanent licensure until it knew the results of the federal investigation, *id*. at 24; (vi) the absence of a written determination by the Commissioner of Professional and Financial Regulation under 10 M.R.S.A. § 8003-B(2)(G) "negates the Board's claim of confidentiality," *id*. at 25-26; and (vii) the Board has waived any claim of confidentiality by making disclosures to federal authorities in violation of section 8003-B, *id*. at 26. None of these arguments is sufficient to overcome the confidentiality provisions of section 8003-B as it applies to this case. Thus, the subpoenas at issue require disclosure of privileged or protected matter to which no exception or waiver applies. Fed. R. Civ. P. 45(c)(3)(A)(iii).

In support of its first listed argument, CAP states that the only complaint at issue is the complaint filed with the Board by Sharon P. on September 6, 2002 and that Sharon P. has "since filed a civil action against Dr. Shinderman and CAP Quality Care, among others . . . which is now in the mandatory pre-litigation screening panel stage of review and extensive discovery has occurred." *Id.* at 20. It provides no evidence to support this assertion and no identification of any documents that have been provided in the "extensive discovery" that might also be subject to the provisions of section 8003-B. In addition, all documents "filed with the court in the action for professional negligence during the prelitigation screening process are confidential." 24 M.R.S.A. § 2853(1-A). All proceedings before the screening panel are confidential. 24 M.R.S.A. § 2857(1). Assuming *arguendo* that the Sharon P. complaint was the only matter under investigation by the Board with respect to Dr.

Shinderman and that the particular documents at issue had been identified by CAP, CAP has nevertheless made no showing that the possible use in another confidential forum of some of the documents which the Board refuses to provide in this proceeding renders those documents exempt from section 8003-B. And certainly, if CAP has already obtained such documents through a different procedure, it has no need to acquire them again from the Board through the subpoena at issue here.

The Board takes exception to CAP's second argument. It points out, correctly, that no statute or regulation requires it to notify the subject of a complaint when it expands the scope of its investigation of that complaint. Board Reply at 2. The only authority cited by CAP, CAP Brief at 22, does not impose such a requirement. *See* 32 M.R.S.A. § 3282-A(1).[6]

With respect to CAP's third argument, CAP asserts that Harwood's communications with Masar in early 2002 regarding Dr. Shinderman concerned his "prescription practices" and thus were "outside the scope of the Sharon P. complaint and properly within the scope of the deposition." CAP Brief at 23. The "Sharon P." complaint was received by the Board on September 6, 2002, Board Reply at 6, presumably after a communication that took place "in early 2002." However, the Board points out that any earlier conversation between Harwood and Masar arose out of information referred to the Board that was treated as an "Assessment and Direction," which permits the Board to "investigate and review a matter to decide whether it will initiate a complaint." *Id.* at 1. Section 8003-B makes "all complaints and investigative records" of the Board confidential during the pendency of an investigation. 10 M.R.S.A. § 8003-B(1). Information concerning contact between

---

[6] In a footnote, CAP contends that the "confidentiality restrictions do not apply" if the Board contends that Dr. Shinderman was not authorized to practice medicine after August 9, 2002 and the conduct it was investigating occurred after that date. CAP Brief at 23 n.19. To the contrary, the Board has the authority to investigate applicants for licensure, as discussed above, and it is undisputed that Dr. Shinderman applied for permanent licensure before August 9, 2002. Nothing in *Golz*, the only authority cited by CAP — and cited without a pinpoint citation — supports its argument as to the licensure of physicians, and 10 M.R.S.A. § 8003-C, enacted in 2003 and not mentioned in *Golz*, specifically provides the Board with authority to investigate complaints of unlicensed practice.

Harwood and Masar accordingly should be treated no differently than other investigative records of the Board with respect to Dr. Shinderman.

CAP's fourth argument, that the Board's investigation was closed when it received the report of Dr. Barry, is based on its assertion that Dr. Barry, "in his capacity as the Board's evaluator," made "determinations" that apparently bound the Board, specifically that: Dr. Barry "questioned Sharon P.'s *bona fides* when filing the Board complaint," that he "found no evidence of substance abuse by Dr. Shinderman or psychiatric impairment," that he "opined that Dr. Shinderman had 'behav[ed] in a responsible, competent, manner with proper judgment and a deep knowledge base in prescribing methadone,'" and that Dr. Shinderman was "fit for full licensure in the state of Maine." CAP Brief at 23. CAP cites no authority for its necessarily-implied assertions that the Board was required to adopt any of Dr. Barry's conclusions or that following completion of any referral of an applicant for licensure to an outside evaluation the Board's investigation of that complaint must be deemed closed or completed, thereby making all of the Board's investigatory records with respect to that applicant immediately available to the public. If that were the state of Maine law, the Board would be unlikely to seek any outside evaluation of any applicant under any circumstances. According to CAP, Dr. Barry "completed his evaluation and filed a confidential report with the Board in a letter dated May 8, 2003." *Id*. at 12, ¶18. The Board voted on June 10, 2003 to further investigate complaint CR02-104 (called the "Sharon P. complaint" by CAP). Exh. O to Board Brief. On October 14, 2003 the board again voted to further investigate this complaint. Exh. Q to Board Brief. Those actions are clearly inconsistent with any "closing" of the investigation and, in the absence of any citation of authority in support of CAP's position, the Board must be considered to be the best judge of its intended use of the report it requested from Dr. Barry. It is highly unlikely that any delegation of its authority to Dr. Barry such as that suggested by CAP would be legally permissible in any event. In addition, the events that

constitute the concluding of an investigation are set forth at 10 M.R.S.A. § 8003-B(1), and the receipt of the report of an independent evaluation of the applicant does not fit within any of those statutory definitions.

CAP's fifth argument also contends that an investigation by the Board is automatically closed by a particular event, in this case the Board's decision not to act on Dr. Shinderman's application for permanent licensure until it knew the results of the federal investigation. CAP Brief at 24. Again without citation to authority, CAP asserts that "as of November 20, 2003, it was the *federal* investigation, not the Board's complaint or investigation, that prompted the withholding of Dr. Shinderman's permanent medical licensure in Maine." *Id*. (emphasis in original). Under this theory, even though final action had not been taken on the application, the Board's investigation was closed, making all of its records immediately available to the public, because it chose to await the results of the federal investigation before taking action. As was the case with CAP's previous argument, awaiting the result of another agency's investigation does not fall within the statutory definitions of the conclusion of an investigation. 10 M.R.S.A. § 8003-B(1). CAP takes nothing by this argument.

CAP next argues that the absence of a written determination under 10 M.R.S.A. § 8003-B(2)(G) by the commissioner "negates the Board's claim of confidentiality." *Id*. at 25-26. It offers no suggestion why this might be so. Merely to state the factors relevant to such a determination and then to state that "[c]onsequently, the absence of a written determination . . . negates the Board's claim of confidentiality," *id*., is to leap to a conclusion without any proffered justification. Neither section 8003-B(2)(G) nor the section of the Board's rules cited by CAP, Exh. 2 to Board Reply, requires a written determination. CAP offers no other authority for this proposition, which deserves no further consideration.

Finally, CAP contends that the Board has waived any claim of confidentiality by making certain disclosures to federal authorities which CAP characterizes as violations of section 8003-B. Specifically, it asserts that Harwood's apparently assumed disclosure to Masar of Sharon P's complaint[7] and of Dr. Barry's report of his evaluation violated section 8003-B in unspecified ways. CAP Brief at 26. CAP concludes that the Board "cannot now claim confidentiality after having already waived its applicability to this case." *Id*. It cites no authority in support of this argument, but in the section of its brief entitled "Relevant Background," CAP argues that the exception to 24 M.R.S.A. § 2510, a different statute, for disclosure to governmental licensing or disciplinary authorities does not apply to the disclosure of Sharon P.'s complaint because "the Drug Enforcement Administration does not qualify as a 'governmental licensing or disciplinary authority' that was concerned in this instance 'with granting, limiting or denying' Dr. Shinderman's privileges to practice medicine." *Id*. at 11 n.13. But section 8003-B specifically provides that a complaint or investigative record may be disclosed during the pendency of an investigation "[t]o . . . federal agencies when the files contain evidence of possible violations of law enforced by those agencies." 10 M.R.S.A. § 8003-B(2)(D). CAP does not contend that either the complaint or the report did not contain evidence of possible violations of law enforced by the DEA and thus has failed to make a *prima facie* showing of violation of section 8003-B.

Insofar as section 2510 itself is concerned, CAP asserts that "DEA's authority to register practitioners who prescribe control [sic] drugs cannot trigger an exception under § 2510(1)(B) because Dr. Shinderman's applications for DEA registration were never acted upon." CAP Brief at 11

[7] In the section of its brief entitled "Factual Background," CAP asserts that "[o]n September 13, 2002, DEA Diversion Investigator Masar informed Owen Colomb, a health care fraud investigator employed by the United States Attorney, in essence that she had obtained a copy of the complaint filed . . . against Dr. Shinderman with the Maine Board of Registration in Medicine." CAP Brief at 10, ¶ 15. At no point in the "Factual Background" section of its brief does CAP offer evidence that it was Harwood, or anyone else associated with the Board, who had provided this copy to Masar.

n.13. Section 2510 allows disclosure of confidential information "[t]o governmental licensing or disciplinary authorities of any jurisdiction . . . that are concerned with granting, limiting or denying a physician's privileges . . . ." 24 M.R.S.A. § 2510(1)(B). Contrary to CAP's careful phrasing in its reference to this statute, CAP Brief at 11 n.13, the exception is not limited to authorities that may grant or deny privileges *to practice medicine*. The statute refers only to privileges in general. Without a registration issued by the DEA, a physician cannot prescribe controlled medications for his or her patients. 21 U.S.C. §§ 823(b), (e), (g)-(h); 824(a); 828(a). Lack of a DEA registration would have the effect of limiting a physician's privileges. Contrary to CAP's arguments, CAP Brief at 11 n.13, neither the fact that the DEA never issued an order to show cause with respect to Dr. Shinderman's registration nor that it took no action with respect to his Illinois registrations makes any difference with respect to the effect of the alleged disclosures by Harwood under the Maine statute. CAP also contends, *id*., that the alleged disclosure violated 24 M.R.S.A. § 2510(3), which provides:

> In no event may confidential information received, maintained or developed by the board, or disclosed by the board to others, pursuant to this chapter, or information, data, incident reports or recommendations gathered or made by or on behalf of a health care provider pursuant to this chapter, be available for discovery, court subpoena or introduced into evidence in any medical malpractice suit or other action for damages arising out of the provision or failure to provide health care services. This confidential information includes reports to and information gathered by a professional review committee.

24 M.R.S.A. § 2510(3). This is so, CAP asserts, because "Investigator Masar was involved in a civil and/or criminal investigation of CAP Quality Care and Dr. Shinderman, a status that disqualified her from receiving the confidential document prepared by Dr. Barry," because such an investigation is equivalent to an action for damages arising out of the provision of or failure to provide health care services. CAP Brief at 11 n.13. It strains the statutory language much too far to characterize DEA's investigation of a registrant or an applicant for registration as an "action for damages." That term

refers to a lawsuit seeking damages, a far cry from any possible role of DEA with respect to Dr. Shinderman. Nor can Dr. Barry's report be considered a "professional competence review" subject to 24 M.R.S.A. § 2510-A, as CAP suggests. *Id*. Section 2510-A makes confidential "all professional competence review records," which are defined as "the minutes, files, notes, records, reports, statements, memoranda, data bases, proceedings, findings and work product prepared at the request of or generated by a professional competence review committee relating to a professional competence review activity." 24 M.R.S.A. § 2502(8). A professional competence review committee is one of several entities "when engaging in professional competence review activity," 24 M.R.S.A. § 2502(4), which is defined as "study, evaluation, investigation, recommendation or action, by or on behalf of a health care entity and carried out by a professional competence committee," 24 M.R.S.A. § 2502(4-B). A health care entity is "[a]n entity that provides or arranges for health care services . . .; [a]n entity that furnishes the services of physicians to another health care entity or to individuals . . .; or . . . [a] professional society or professional certifying organization . . . ." 24 M.R.S.A. §2502(1-D). Clearly, Dr. Barry's report cannot possibly be considered a "professional competence review" under section 2510-A.

For the foregoing reasons, the Board's motion to quash the deposition subpoena for Elizabeth Harwood is **GRANTED** to the limited extent of prohibiting any questions of her relating specifically to the Board's investigation of Dr. Shinderman[8] and otherwise **DENIED;** and the motion of CAP Quality Care, Inc. for an order compelling the Maine Board of Licensure in Medicine to respond to its subpoena *duces tecum* served on April 13, 2006 by producing any documents or information other than that which the Board has already produced is **DENIED**.

Dated this 13th day of June 2006.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge

[8] Consistent with the Board's position, *see* footnote 5 *supra*, Ms. Harwood may be asked general questions concerning standard operating procedures for conducting investigations.